TRINETTE G. KENT (State Bar No. 222020)
Lemberg Law, LLC
1100 West Town & Country Rd.
Suite 1250
Orange, California 92868
Telephone: (480) 247-9644
Facsimile: (480) 717-4781
E-mail: tkent@lemberglaw.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Margaret Ritzler, Hank Herber, Linda Wilbur, Thomas Rocco, Jerry Dubose, April Fisher, and Tewana Nelson, *on behalf of themselves and all others similarly situated,* | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| | |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| Kia America, Inc., | |
| Defendant. | |

Plaintiffs, Margaret Ritzler, Hank Herber, Linda Wilbur, Thomas Rocco, Jerry Dubose, April Fisher, and Tewana Nelson (collectively, "Plaintiffs"), by undersigned counsel, bring the following Class Action Complaint against Defendant Kia America, Inc., and allege, on their own behalf and on behalf of all those similarly situated, as follows:

**INTRODUCTION**

1.      Plaintiffs bring this lawsuit on behalf of themselves and proposed classes of Georgia, Indiana, New Mexico, Pennsylvania, Tennessee, Texas, and Virginia purchasers and lessees of defective 2020-2023 Kia Telluride vehicles (collectively, the "Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and serviced by Defendant Kia America, Inc. ("Kia" or "Defendant").

2.      Plaintiffs and the Classes were damaged because the Class Vehicles contain defective windshields which cause the windshields to crack, chip and/or fracture under normal driving conditions (the "Windshield Defect" or the "Defect").

3.      The Windshield Defect poses an extreme safety hazard to drivers, passengers, and pedestrians because the spontaneously cracking Class Vehicle windshields impair the driver's view, distract the driver, and can result in dislodged glass that can injure drivers, passengers and pedestrians.

4.      Kia learned about the Defect immediately after it began selling the Class Vehicles in 2019 via, *inter alia,* its daily review of NHTSA complaints where Class Vehicle owners have submitted hundreds of complaints concerning the Windshield

2

Defect, Kia's review of complaints and inquiries about the Windshield Defect made directly to Kia by Class Vehicle owners and Kia dealerships, and other internal sources not available to the public including Kia's review of windshield part sales data, warranty data, and internal testing.

5. However, despite its knowledge of the Defect, Kia failed to disclose and conceals the Windshield Defect from purchasers and lessees.

6. Had Plaintiffs and the Class Members known about the Windshield Defect, they would not have purchased the Class Vehicles or would have paid substantially less for them.

7. Moreover, Kia refuses to replace the defective windshields under its warranty, forcing Class Vehicle owners to pay approximately $1,000 for each replacement windshield.

8. Further, Kia's replacement windshields are also defective, resulting in Class Vehicle owners repeatedly replacing their windshields at their own expense.

9. Kia has not recalled the Class Vehicles to repair the Windshield Defect, has not offered its customers a suitable repair or non-defective replacement windshield free of charge, and has not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the Windshield Defect.

10. Kia's conduct set forth in this Complaint is in violation of the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.*, Indiana Deceptive

3

Consumer Sales Act, Ind. Code § 24-5-0.5-1, *et seq.*, New Mexico Unfair Trade

Practices Act,  N.M. Stat. Ann. § 57-12-2, *et seq.,* Pennsylvania Unfair Trade

Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq.,* Tennessee

Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, *et seq.,* Texas

Deceptive Practices Act, Tex. Bus. & Com. Code § 17.41, *et seq.,* Virginia Consumer

Protection Act, Va. Code Ann. §§ 59.1-196, *et seq.,* and constitutes a breach of

express and implied warranties and the Magnuson-Moss Warranty Act.

11.     Kia has and will continue to benefit from its unlawful conduct – by

selling more vehicles, at a higher price, and avoiding warranty obligations  –  while

consumers are harmed at the point of sale as their vehicles continue to suffer from the

unremedied Windshield Defect.

12.     To remedy Kia's unlawful conduct, Plaintiffs, on behalf of the proposed

class members, seek damages and restitution from Kia, as well as notification to class

members about the defect.

## **PARTIES**

13.     Plaintiff Margaret Ritzler ("Ms. Ritzler"), is an individual residing in

Thoreau, New Mexico.

14.     Plaintiff Hank Herber ("Mr. Herber"), is an individual residing in

Madisonville, Tennessee.

15.     Plaintiff Linda Wilbur ("Ms. Wilbur"), is an individual residing in

Indianapolis, Indiana.

4

16. Plaintiff Thomas Rocco ("Mr. Rocco"), is an individual residing in Linwood, New Jersey.

17. Plaintiff Jerry Dubose ("Mr. Dubose"), is an individual residing in Webster, Texas.

18. Plaintiff April Fisher ("Ms. Fisher"), is an individual residing in Lynchburg, Virginia.

19. Plaintiff Tewana Nelson ("Ms. Nelson"), is an individual residing in Fayetteville, North Carolina.

20. Defendant Kia America, Inc. is a California corporation with a principal place of business at 111 Peters Canyon Road, Irvine, California 92606-1790.

21. Defendant Kia America, Inc., through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide. Defendant Kia America, Inc. is the warrantor and distributor of the Class Vehicles in the United States.

22. Moreover, decisions regarding the marketing and sale of the Class Vehicles, the disclosure or non-disclosure of the Windshield Defect, the initiation of the Customer Satisfaction Initiative, and the handling of consumer complaints regarding the Windshield Defect, were in whole or substantial part made by Kia America, Inc. in California and were purposefully emanated by Kia America, Inc. in California. Additionally, it was Kia America, Inc. in California that prepared and provided written instructions to its nationwide authorized dealerships regarding how

5

to handle consumer complaints regarding the Windshield Defect.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100

or more class members, (ii) there is an aggregate amount in controversy exceeding

$5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because

Plaintiffs and Class Members, and Kia are citizens of different states.

24.     This Court also has subject matter jurisdiction over this action pursuant

to 28 U.S.C. § 1331 because Plaintiffs present a claim under the federal Magnuson-

Moss Warranty Act, 15 U.S.C. § 2301, et seq.  As to the state law claims, this Court

has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

25.     Personal jurisdiction and venue are proper in this District as Defendant is

headquartered in this District.

## MARGARET RITZLER'S INDIVIDUAL ALLEGATIONS

26.     On July 13, 2021, Ms. Ritzler purchased a new 2022 Kia Telluride,

Vehicle Identification Number 5XYP5DHC8NG194087 (hereafter the "Ritzler

Vehicle") from Fiesta Kia, an authorized Kia dealership located in Albuquerque, New

Mexico.

27.     Prior to the sale, Ms. Ritzler spoke with Fiesta Kia, who assured Ms.

Ritzler that the Ritzler Vehicle was reliable and accompanied by Kia's New Vehicle

Limited Warranty and was free from defects of workmanship and that the car was safe

6

and reliable.

28.     In or around August 2021, Ms. Ritzler went out to her vehicle in the morning and observed a crack across the middle of the Ritzler Vehicle's windshield. Ms. Ritzler did not observe any impact damage to the Ritzler Vehicle's windshield prior to observing the crack.

29.     Below is a picture of the cracked windshield:



30.     On or about August 26, 2021, Ms. Ritzler presented her vehicle to Fiesta Kia, complained that her vehicle suffered from the Windshield Defect and described the circumstances of her windshield crack, and requested that Fiesta Kia replace her

7

defective windshield at no cost to her and under Kia's warranty.

31.    In response, Fiesta Kia told Ms. Ritzler that a replacement windshield was not covered by Kia's warranty.  Fiesta Kia refused to provide her with a replacement windshield under Kia's warranty.

32.    In light of Fiesta Kia's refusal to repair or replace her defective windshield, Ms. Ritzler was forced to pay Fiesta for a windshield replacement. The total cost of the replacement windshield, including recalibration, was $1,064.70.  She submitted submit a claim to her insurance company, paid a $500 deductible and the insurance company covered the difference.

33.    Moreover, despite Ms. Ritzler seeking a replacement windshield in August 2021, the replacement windshield was on backorder and was not available for installation until January 13, 2022, five months later. By the time the cracked windshield was replaced, the crack had spread across the entire length of the windshield.  During this time period the size and location of the crack negatively impacted Ms. Ritzler's ability to view the road.

34.    Unfortunately, on February 14, 2022, within weeks of the replacement windshield being installed, the replacement windshield suffered from the Windshield Defect and cracked once again even though Ms. Ritzler did not observe anything impact the windshield.

35.    Below are pictures of the second cracked windshield:

8



36.    With respect to the second cracked windshield, Fiesta again declined to

cover the replacement windshield under Kia's warranty, Ms. Ritzler was forced to pay

out-of-pocket for the second replacement windshield, and the windshield was not

installed until April 15, 2022.  In total, the cost of the second replacement windshield

was $860.

37.    When Ms. Ritzler's windshields cracked, the cracks were extensive,

within her line of sight, and impaired her ability to drive. For instance, Ms. Ritzler had

to peek above or below the crack to see the road and oncoming traffic, and the cracks

exacerbated sunlight.

9

38. Ms. Ritzler never received a copy of Kia's letter announcing a "customer satisfaction initiative" (the "Goodwill Letter").

39. Ms. Ritzler, through her counsel, sent a letter to Kia advising it that the Ritzler Vehicle suffered from the Windshield Defect and that Ms. Ritzler was denied a replacement windshield.

40. At all times, Ms. Ritzler has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### HANK HERBER'S INDIVIDUAL ALLEGATIONS

41. On September 21, 2021, Mr. Herber purchased a new 2022 Kia Telluride, Vehicle Identification Number 5XYP54HC4NG217395 (hereafter the "Herber Vehicle") from Rusty Wallace Kia Alcoa ("Wallace"), an authorized Kia dealership located in Louisville, Tennessee.

42. Prior to the sale, Wallace assured Mr. Herber that the Herber Vehicle was a safe vehicle and accompanied by Kia's New Vehicle Limited Warranty and was free from defects of workmanship and that the car was safe and reliable.

43. In addition, prior to purchasing the vehicle Mr. Heber reviewed Kia's brochures concerning the Class Vehicles.

44. Approximately two months after Mr. Herber purchased his vehicle, Mr. Herber observed a crack across the Herber Vehicle's windshield. Mr. Herber did not observe any impact damage to the Herber Vehicle's windshield prior to observing the crack.

45.     The cracked windshield distracted Mr. Herber and increased sun glare.
Additionally, Mr. Herber was concerned that driving with the cracked windshield was
not safe and the vehicle lacked adequate protection in the event of a collision.

46.     On November 30, 2021, Mr. Herber presented his vehicle to Wallace,
complained that his vehicle suffered from the Windshield Defect, and requested that
Wallace replace his defective windshield at no cost to him and under Kia's warranty.

47.     In response, Wallace told Mr. Herber that the windshield must have
cracked due to impact damage and was not covered by Kia's warranty
notwithstanding that Mr. Herber overserved no such outside impact.  Wallace refused
to provide him with a replacement windshield under Kia's warranty.

48.     In light of Wallace's refusal to repair or replace his defective windshield,
Mr. Herber was forced to pay Wallace $1,016.54 for a replacement windshield.

49.     Mr. Herber never received a copy of Kia's Goodwill Letter.

50.     Mr. Herber, through his counsel, sent a letter to Kia advising it that the
Herber Vehicle suffered from the Windshield Defect and that Ms. Herber was denied
a replacement windshield.

51.     At all times, Mr. Herber has driven his vehicle in a foreseeable manner
and in the manner in which it was intended to be used.

## LINDA WILBUR'S INDIVIDUAL ALLEGATIONS

52.     On February 17, 2022, Ms. Wilbur purchased a new 2022 Kia Telluride
Vehicle Identification Number 5XYP34HC9NG261916 (hereafter the "Wilbur

11

Vehicle") from Ray Killman GMC Truck, Inc. ("Killman"), an authorized Kia dealership in Indianapolis, Indiana.

53.    Prior to the sale, Killman assured Ms. Wilbur that the Wilbur Vehicle was safe and accompanied by Kia's New Vehicle Limited Warranty and was free from defects of workmanship and that the car was safe and reliable.

54.    Additionally, Ms. Wilbur reviewed Kia's brochures concerning the Class Vehicles.

55.    In or around March 2022, Ms. Wilbur observed a crack across the Wilbur Vehicle's windshield even though Ms. Wilbur did not observe any impact damage to the Wilbur Vehicle's windshield prior to observing the crack.

56.    The cracked windshield impaired Ms. Wilbur's visibility. For instance, at night the windshield crack resulted in significant glare from oncoming headlights.

57.    On or about April 1, 2022, Ms. Wilbur presented her vehicle to Killman, complained that her vehicle suffered from the Windshield Defect, and requested that Killman replace her defective windshield at no cost to her and under Kia's warranty.

58.    In response, Killman failed to provide a replacement windshield under Kia's warranty.

59.    In light of Killman's refusal to repair or replace her defective windshield under Kia's warranty, Ms. Wilbur was forced to pay Killman $841.32 for a replacement windshield.  She submitted the claim to her insurance company and paid a $500 deductible.

60.    Ms. Wilbur never received a copy of Kia's Goodwill Letter.

61.    Ms. Wilbur, through her counsel, sent a letter to Kia advising it that the Wilbur Vehicle suffered from the Windshield Defect and that Ms. Wilbur was denied a replacement windshield.

62.    At all times, Ms. Wilbur has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## THOMAS ROCCO'S INDIVIDUAL ALLEGATIONS

63.    On August 14, 2020, Mr. Rocco purchased a new 2021 Kia Telluride Vehicle Identification Number 5XYP5DHCXMG100516 (hereafter the "Rocco Vehicle") from Matthews Planet Kia ("Matthews"), an authorized Kia dealership located in Blakely, Pennsylvania.

64.    Prior to the sale, Matthews assured Mr. Rocco that the Rocco Vehicle was accompanied by Kia's New Vehicle Limited Warranty and was free from defects of workmanship and that the car was safe and reliable.

65.    Mr. Rocco also reviewed Kia's brochure for the Class Vehicles prior to purchasing his vehicle.

66.    In May 2022, Mr. Rocco observed a chip on the Rocco Vehicle's windshield even though Mr. Rocco did not observe any impact damage to the Rocco Vehicle's windshield prior to observing the crack.  Over time the chip spread to a crack across the windshield.

67.    The windshield crack was in Mr. Rocco's line of sight and impaired Mr.

13

Rocco's visibility. The crack also exacerbated sun glare and oncoming headlights.

68.    On or about May 11, 2022, Mr. Rocco presented his vehicle to Matthews, complained that his vehicle suffered from the Windshield Defect, and requested that Matthews replace his defective windshield at no cost to him and under Kia's warranty.

69.    In response, Matthews told Mr. Rocco that a replacement windshield was not covered by Kia's warranty.  Matthews refused to provide him with a replacement windshield under Kia's warranty and referred him to Safelite.

70.    In light of Matthews Planet Kia's refusal to repair or replace his defective windshield, the Rocco Vehicle remains unrepaired.

71.    Mr. Rocco never received a copy of Kia's Goodwill Letter.

72.    Mr. Rocco, through his counsel, sent a letter to Kia advising it that the Rocco Vehicle suffered from the Windshield Defect and that Mr. Rocco was denied a replacement windshield.

73.    At all times, Mr. Rocco has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## JERRY DUBOSE INDIVIDUAL ALLEGATIONS

74.    On November 28, 2020, Mr. Dubose purchased a new 2021 Kia Telluride Vehicle Identification Number 5XYP3DHC1MG133068 (hereafter the "Dubose Vehicle") from Fredy Kia ("Fredy"), an authorized Kia dealership located in Houston, Texas.

75.    Prior to the sale, Fredy assured Mr. Dubose that the Dubose Vehicle was

14

accompanied by Kia's New Vehicle Limited Warranty and was free from defects of workmanship and that the car was safe and reliable.

76.    In or around August of 2021, Mr. Dubose observed a crack across the Dubose Vehicle's windshield even though Mr. Dubose did not observe any impact damage to the Dubose Vehicle's windshield prior to observing the crack.  Over time the crack continued to spread across the windshield.

77.    The cracked windshield negatively impaired Mr. Dubose's visibility and exacerbated sun glare.

78.    Shortly thereafter, Mr. Dubose presented his vehicle to Fredy, complained that his vehicle suffered from the Windshield Defect, and requested that Fredy replace his defective windshield at no cost to him and under Kia's warranty.

79.    In response, Fredy Kia told Mr. Dubose that there was a point of impact on the windshield and the issue was not covered by Kia's warranty even though Mr. Dubose did not observe any such impact.  Fredy Kia refused to provide him with a replacement windshield under Kia's warranty.

80.    In light of Fredy's refusal to repair or replace his defective windshield, Mr. Dubose  requested that Safelite replace his windshield on or about August 5, 2021.  As a result of part unavailability, Safelite did not replace the windshield until December 13, 2021.  The total cost of the replacement windshield was $1,116.40.

81.    Unfortunately, within months the replacement windshield cracked as well.  Specifically, on or about April 11, 2022, the replacement windshield cracked

15

even though Mr. Dubose did not observe anything impact the windshield.

82.     Mr. Dubose never received a copy of Kia's Goodwill Letter.

83.     Mr. Dubose, through his counsel, sent a letter to Kia advising it that the Dubose Vehicle suffered from the Windshield Defect and that Mr. Dubose was denied a replacement windshield.

84.     At all times, Mr. Dubose has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## APRIL FISHER INDIVIDUAL ALLEGATIONS

85.     In May 2022, Ms. Fisher purchased a new 2022 Kia Telluride Vehicle Identification Number 5XYP6DHC1NG275414 (hereafter the "Fisher Vehicle") from Kia of Lynchburg, an authorized Kia dealership located in Lynchburg, Virginia.

86.     Prior to the sale, the Kia dealership assured Ms. Fisher that the Fisher Vehicle was safe and accompanied by Kia's New Vehicle Limited Warranty and was free from defects of workmanship and that the car was safe and reliable.

87.     Additionally, Ms. Fisher reviewed the window sticker affixed to the Class Vehicles which emphasized their safety.

88.     On or about July 27, 2022, a small pebble impacted the Fisher Vehicle's windshield and quickly resulted in a crack across the entire length of the windshield.

89.     The windshield crack impaired Ms. Fisher's visibility, especially during the rain. It also exacerbated sun glare and oncoming headlights.

90.     Ms. Fisher contacted Kia of Lynchburg, described the circumstances of

16

her windshield crack and sought a replacement windshield under Kia's warranty. In response, the dealership informed Ms. Fisher the windshield replacement was not covered under warranty.

91.    As a result of the dealership's refusal to replace the windshield under Kia's warranty, on August 2, 2022, Ms. Fisher requested that Safelite Auto Glass to replace the windshield.  The total cost of repair was $937; Ms. Fisher submitted the bill to her insurance company and paid a $500 deductible.

92.    However, the following day, August 3, 2022, the replacement windshield cracked even though Ms. Fisher did not observe anything hit the windshield. Ms. Fisher again contacted Kia of Lynchburg to request that it replace the cracked windshield however the dealer again refused to cover the replacement windshield under Kia's warranty.

93.    As a result of the dealership's refusal to replace the cracked windshield under Kia's warranty, on August 11, 2022, Ms. Fisher again had Safelite Auto Glass replace the windshield and she paid another $500 deductible.

94.    Unfortunately, the second replacement windshield has already cracked once again.

95.    Ms. Fisher never received a copy of Kia's Goodwill Letter.

96.    Ms. Fisher, through her counsel, sent a letter to Kia advising it that the Fisher Vehicle suffered from the Windshield Defect and that Ms. Fisher was denied a replacement windshield.

17

97.    Due to the Windshield Defect and resulting cracks, the Fisher Vehicle's

Advanced Driving Assistance Systems have not been operating correctly.

98.    At all times, Ms. Fisher has driven her vehicle in a foreseeable manner

and in the manner in which it was intended to be used.

## TEWANA NELSON INDIVIDUAL ALLEGATIONS

99.    On February 19, 2022, Ms. Nelson purchased a new 2022 Kia Telluride

Vehicle Identification Number 5XYP5DHC8NG261500 (hereafter the "Nelson

Nelson") from Kia Autosport of Columbus, an authorized Kia dealership located in

Columbus, Georgia.

100.    Prior to the sale, Kia Autosport of Columbus assured Ms. Nelson that the

Fisher Vehicle was accompanied by Kia's New Vehicle Limited Warranty and was

free from defects of workmanship and that the car was safe and reliable.

101.    Additionally, Ms. Nelson reviewed Kia's brochure concerning the Class

Vehicles prior to the sale.

102.    In July 2022, Ms. Nelson observed a small pebble impact her vehicle's

windshield resulting in a chip which quickly spread to a crack across the entire length

of the windshield.

103.    The windshield cracking became so extensive that Ms. Nelson

temporarily ceased driving the vehicle until the windshield was replaced out of

concern that it was unsafe to drive.

104.    Ms. Nelson immediately thereafter presented her vehicle to an authorized

18

Kia dealership, described the circumstances of the windshield crack, and requested that the dealership replace the windshield under Kia's warranty. In response, the dealership informed Ms. Nelson the windshield replacement was not covered under warranty.

105.    As a result, on July 28, 2022, Ms. Nelson had Allstate Glass in Fayetteville, North Carolina replace her windshield. The total cost of repair was $1,167.84. Ms. Nelson submitted the bill to her insurance company and paid a $500 deductible.

106.    Ms. Nelson never received a copy of Kia's Goodwill Letter.

107.    Ms. Nelson, through her counsel, sent a letter to Kia advising it that the Fisher Vehicle suffered from the Windshield Defect and that Ms. Fisher was denied a replacement windshield.

108.    At all times, Ms. Nelson has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

## FACTUAL ALLEGATIONS

### The Windshield Defect and Kia's "Customer Satisfaction Initiative" / Goodwill Letter

109.    In the spring of 2019 Kia released the brand-new Telluride, a mid-size crossover SUV, as a 2020 model.

110.    Since then it has sold tens of thousands of Telluride vehicles for model years 2020, 2021, 2022 and 2023.

19

111.   The Class Vehicles – which include 2020-2023 Kia Tellurides – suffer from the Windshield Defect, which causes the Class Vehicles' front windshield to crack, chip and/or fracture for no reason at all and/or under circumstances that would not cause non-defective windshields to similarly fail.  As Plaintiffs allege above, and as set forth in the NHTSA complaints attached hereto as Exhibits B, C and D and reproduced below, Class Vehicle owners report that their windshields crack spontaneously where there was no observed impact or under otherwise normal driving conditions that would not cause a non-defective windshield to crack and fail (as opposed to merely chip), such as following impact from minor road debris.

112.   The Windshield Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on visibility, the distracting nature of the resulting cracks, as well as the Class Vehicles' structural integrity, and the potential for injury.

113.   Plaintiffs each allege the Windshield Defect and resulting cracks impaired their visibility, was distracting and/or otherwise prevented them from safely and reliably using their vehicles.

114.   Other Class Vehicle owners have made similar complaints. *See, e.g.*:

- "I just recently bought a 2022 Kia Telluride 7 days ago and while driving on the freeway the windshield shattered in the lower corner of driver side. There was no car in front of me (not a close distance) or near me for that matter and there was no overpass for a rock to have fallen from. **My windshield shattered and glass landed in my face, eyes, and mouth, and all over the inside of my car. Luckily I was able to maintain some control as there were no other vehicles in close**

20

1       **proximity. I've had rocks hit my windshield before but never to the point of**
2       **causing this kind of damage."** (2022 Telluride, No. 11432080, September 8,
3       2021);

- "This will be **third time** replacing the windshield in just over a year due to the same type of incident. **My families safety was at risk due to the obstruction caused by the windshield cracking due to the impact of the small stone**." (2020 Telluride, No. 11427612, August 3, 2021);

- "MY WINDSHIELD HAS TWO CRACKS IN THAT **IMPAIRS VISIBILITY**." (2020 Telluride, No. 11310546, February 21, 2020);

- "The windshield cracked spontaneously on its own. There is no chip in the windshield and no object hit it. The crack is over twenty inches long and curved. **I fear for my safety driving the car now**." (2021 Telluride, No. 11431157, August 31, 2021);

- "**It affects safety because it is directly in drivers vision and is blinding when the sun reflects and refracts through the crack**." (2021 Telluride, No. 11435493, October 5, 2021).

     115.   Given the inherent safety risks associated with driving a vehicle with a cracked windshield, many states make it illegal to operate a vehicle with a cracked windshield where the windshield is defective such that it impairs the driver's vision. *See, e.g.,* Georgia Code: § 40-8-73(e) ("No motor vehicle shall be operated with a windshield or rear window having a starburst or spider webbing effect greater than three inches by three inches.");

https://law.lis.virginia.gov/admincode/title19/agency30/chapter70/section210/

(Virginia vehicles will fail a vehicle inspection if "There is a pit, chip, or star crack larger than 1-1/2 inches in diameter at any location in the windshield above the three-inch line at the bottom" or "At any location in the windshield above the three-inch line at the bottom (as measured from the junction of the dash board and the windshield)

21

there is more than one crack from the same point if at least one of the cracks is more than 1-1/2 inches in length. There is any crack that weakens the windshield so that one piece may be moved in relation to the other. (If there is more than one crack running from a star crack that extends above the three-inch line, the windshield shall be rejected.)") (last visited April 10, 2023); 75 Pa. Stat. and Cons. Stat. Ann. § 4524 ("No person shall drive any motor vehicle with any sign, poster or other nontransparent material upon the front windshield which materially obstructs, obscures or impairs the driver's clear view of the highway or any intersecting highway except an inspection certificate, sticker identification sign on a mass transit vehicle or other officially required sticker"); https://www.dps.texas.gov/section/vehicle-inspection/faq/faq-items-inspection (Texas vehicles may fail a state required inspection if "a damaged windshield creates a significant visibility issue for the driver.") (last visited April 10, 2023).

116. Moreover, in the event a vehicle is involved in a collision, an intact windshield assists in transferring the force of a front-end impact down to the chassis, which reduces the effect of the impact felt inside the vehicle and helps protect the passengers. However, where a vehicle's windshield is cracked and then subsequently shatters during a collision, the vehicle occupants are at greater risk of sustaining injuries.

117. In addition, the windshield is a vital component of a vehicle's safety restraint system, which also includes airbags and seatbelts. These safety features,

22

including the windshield, are all part of a safety network.  Each individual component of this network is dependent on the others functioning properly.  Thus, if there is a compromise or weakness in just one aspect of the network, the likelihood of other parts not working properly is increased.  All components of a vehicle's safety restraint system are designed to work together to keep vehicle occupants within the relative safety of the passenger compartment during collision or roll over.  To that end, the windshield provides support that a passenger-side airbag needs to deploy properly.  If the windshield is compromised, the airbag may be useless in a collision.  Similarly, the windshield provides much of the roof support for most vehicles.  As a result, the windshield is a crucial component in preserving the structural integrity of the vehicle's passenger compartment during roll-overs in that the windshield supports the roof, thereby keeping the roof from collapsing and crushing the driver and passengers.

118.  The Defect can also jeopardize the functioning of Class Vehicle "Advanced Driving Assistance Systems," which rely on an intact and properly functioning windshield to operate.  For instance, the "Lane Keeping Asist" system "is designed to detect the lane markers on the road with a  front view camera on the windshield."[1] However, the Windshield Defect and resulting windshield cracks prevent these safety systems from properly functioning.  In addition, the front cameras often need to be recalibrated when windshields are replaced, further increasing the

---

[1] https://www.kia.com/us/content/dam/kia/us/en/images/technology/Kia-Advanced-Driving-Assistance-Systems.pdf (last visited April 10, 2023).

23

costs of replacing the defective windshields.

**The Customer Satisfaction Initiative and Kia's Failure to Repair the Defect Under Its Warranty**

119.    On or about November 14, 2019, Kia sent a letter (the Goodwill Letter) to some but not all owners of the Class Vehicles advertising its "Customer Satisfaction Initiative" and stating that in some scenarios it would replace defective windshields as a "goodwill gesture."

120.    In the letter, Kia admitted that "as part of our ongoing monitoring of Telluride performance, we have identified that in some instances, customers have reported windshields chipping followed by extensive cracking within a short period of time, thereby preventing repair of the chip."

121.    A copy of the letter is attached as Exhibit A.

122.    However, the Goodwill Letter is a wholly inadequate and illusory sham remedy for the Windshield Defect.

123.    First, the Customer Satisfaction Initiative is underinclusive, limited to certain 2020 Telluride vehicles, and does not apply to the vast majority of Class Vehicle owners, including the Plaintiffs, who purchase or leased 2021-2023 Telluride vehicles and were not provided a copy of the Goodwill Letter. Indeed, each of the Plaintiffs were denied warranty repairs regarding their vehicles' defective windshields. Other owners have likewise complained to NHTSA that they are denied repairs under the Customer Satisfaction Initiative because it excludes 2021-2023

24

Tellurides. *See, e.g.*:

- <u>NHTSA Complaint, September 15, 2022, ID No. 11484682</u>: "**While driving at approximately 35 MPH, with no vehicles, pedestrians, lawnmowers, trees, road hazards, etc., near, the windshield spontaneously cracked near the passenger side pillar. The initial crack was circular with spider-webbing, the longest of which was approximately 6 inches (not exact due to being measured with a hand as reference). The vehicle was immediately parked, and upon return to the vehicle 1 hour and 45 minutes later, the spider-webbing had spread to approximately half the length of the windshield from the initial crack at the passenger side, to the driver side**. My wife confirmed that there were no vehicles traveling the opposite direction, no pedestrians, overpasses, trees, vehicles, or other logical causes near the vehicle immediately following the initial crack. It seemed to occur spontaneously, my wife stated she heard what she could best describe as "the sound of glass cracking like in a horror movie" and observed the initial crack. Due to the rate of the spreading, and fear of further integrity failures, the vehicle is parked. **I contacted Kia due to the 2020 good will letter concerning windshields, and was told this did not apply to the 2022 due to it not being the appropriate year, and would have to cover the replacement of the window out of pocket or through insurance.** No warnings, no noise indicative of something striking the windshield, no damage to any other components including the paint, etc. It just seemingly cracked, the only reason I could deduce is due to the temperature today being approximately 85 degrees, and the vehicle was parked in the sunlight due to the parking not being shaded. Perhaps the exposure resulted in the initial failure and subsequent spider-webbing. This vehicle was purchased brand new on 12 June, 2022."

124.   Second, the Letter falsely suggests that the Windshield Defect is not covered under the New Vehicle Limited Warranty and is caused by an outside influence, rather than an inherent manufacturing and/or design defect with the windshield, where it says "Your vehicle's 2020 warranty specifically excludes coverage for broken, chipped, scratched or damaged glass due to outside influence." Goodwill Letter (emphasis supplied).  Indeed, it claims that Kia "will replace your

25

Telluride's windshield as a goodwill gesture should it chip and crack thereby

preventing repair of the chip while we continue to investigate this issue," not pursuant

to its warranty. *Id.* (emphasis supplied).

125.    Third, in practice Kia refuses to repair or replace the Windshield Defect

when given a reasonable opportunity to do so – including 2020 Kia Tellurides that are

purportedly covered by Kia's Customer Satisfaction Initiative.  For instance, NHTSA

complaints detail 2020 Telluride owners complaining that they were denied repairs

under the CSI:

- NHTSA Complaint, July 12, 2021, ID No. 11424335: "My wife and I
  purchased a 2020 KIA Telluride in November of 2019. A few weeks after we
  took delivery we received the attached letter dated 12-9-2019 from KIA
  stating there may be an issue with the windshield cracking and that they
  would replace the windshield if this happened. **This did happen and KIA
  replaced the windshield on 03-26-2020 at no charge as they had stated in
  the letter we received. On the morning of 6-5-2021 I moved the Telluride
  out of the garage to the driveway, when I went to move it back in a couple
  of hours later the windshield was cracked across the drivers field of
  vision**. We called the dealership (Moritz) and made an appointment for 6-22-
  2021 (we were on vacation from 6-9-2021 until 6-19-2021) to have the
  windshield replaced. After the windshield was replaced we were told it would
  be $868.31 (invoice attached), **the MORITZ KIA service manager (Joby
  Spradley) told the service advisor (Trai Chavez) to inform us that he had
  checked with a 'KIA representative' and KIA would not pay for
  replacing the cracked windshield even though the windshield cracked
  while the vehicle was sitting in our driveway. The letter we received did
  not state that KIA would only replace the windshield one time. We
  shouldn't have had to pay a for manufacturing / quality issue.**"

126.    Further, upon information and belief when vehicles are brought in for

repair, Defendant's dealers search for any excuse to deny coverage, often claiming

that an impact caused the failure, notwithstanding the fact that the customer witnessed

26

no impact, there is no visual evidence of an impact, or that any impact was so slight it

should not have caused the windshield to fail.   On information and belief,

Defendant's dealers' systematic denial of valid coverage claims is part of a concerted

effort orchestrated by Defendant to minimize the cost of warranty claims and its

"Customer Satisfaction Initiative."

127.   Moreover, on information and belief, when windshield repairs are

performed by Defendant's dealers (for charge, or free of charge under the New

Vehicle Limited Warranty, or under goodwill, as the case may be), defective

windshields are merely replaced with similarly defective windshields.  See the

following representative NHTSA complaints:

- NHTSA Complaint, September 7, 2019, ID No. 11253922: **THIS IS MY
  SECOND REPORT. MY WINDSHIELD ON MY 2020 KIA
  TELLURIDE IS CRACKED AGAIN.** THIS TIME IT'S ON THE
  PASSENGER SIDE OF THE WINDSHIELD. IT'S A LONG CRACK
  THAT STARTS AT THE A PILLAR AND TRAVELS ACROSS THE
  WINDSHIELD. WHEN I GOT IN MY CAR TO GO SOMEWHERE I SAW
  THE CRACK. I AM THE ONLY DRIVER. I NEVER SAW OR HEARD
  ANYTHING HIT THE WINDSHIELD THIS TIME. IT COST 1500
  DOLLARS TO REPAIR IT LAST TIME, WHICH WAS FOUR MONTHS
  AGO.ITS GOING TO GET EXPENSIVE IF THIS KEEPS UP. I HAVE NO
  IDEA HOW THIS OCCURRED.

- NHTSA Complaint, March 29, 2020, ID No. 11326531: WE PURCHASED
  THE NEW TELLURIDE IN DECEMBER, 2019. THE WINDSHIELD
  CRACKED AND THE CRACK RAN ACROSS HALF OF THE
  WINDSHIELD. KIA DID REPLACE THE WINDSHIELD WITHOUT A
  CHARGE. THIS WAS ONE IN FEBRUARY 2020. **OUR NEW
  WINDSHIELD NOW AND A BIG CHIP IN IT, ABOUT THE SIZE OF
  A PENCIL ERASER.** THERE IS LESS THAN 7000 MILES ON IT.
  THERE MUST BE A DEFECT OR QUALITY ISSUE IN THE

27

WINDSHIELD GLASS THEY ARE USING. WE ARE IN OUR LATE 60'S. NO OFF READING OR RISKY DRIVING. WE WERE DRIVING ON THE INTERSTATE WHEN THE NEW CHIP HAPPENED.

- NHTSA Complaint, June 23, 2020, ID No. 11330351: WINDSHIELD CRACKED FROM CHIP THAT I HEARD HAPPEN ON THE HIGHWAY 3/6/2020. **THIS WINDOW IS AN OEM REPLACEMENT WINDOW FROM KIA. THE FIRST WINDSHIELD HAD THE EXACT SAME THING HAPPEN** IN JULY 2019 WITHIN THE FIRST MONTH OF PURCHASING THE CAR.

- NHTSA Complaint, June 30, 2020, ID No. 11331695: I HAVE HAD MY KIA TELLURIDE EX 2020 FOR THE PAST 4 MONTHS. ON MONTH 3 ITS WINDSHIELD CRACKED WHILE DRIVING ON RIGHT LOWER SIDE AND CRACKS STARTED TO QUICKLY EXPAND NEEDING TO REPLACE THE WINDSHIELD THROUGH INSURANCE AND PAID 500$ DEDUCTIBLE. I NEVER ANYTHING HITTING THE WINDSHIELD AT THAT TIME. **AGAIN JUST A FEW DAYS AGO IN MONTH 4 OF OWNERSHIP WINDSHIELD GLASS HAS CHIPPED FROM TWO PLACES.** I NEVER SAW OR HEARD ANYTHING HITTING THE GLASS WHILE DRIVING AND I AM THE ONLY DRIVER.

- NHTSA Complaint, January 3, 2021, ID No. 11386171: HAVE NOT EVEN MADE MY FIRST PAYMENT ON MY NÉE **2021 TELLURIDE AND HAVE HAD TO REPLACE THE WINDSHIELD TWICE.** BOTH TIMES THE DAMAGE WAS CAUSE BY ROAD DEBRIS HITTING THE WINDSHIELD, BUT THE CRACK QUICKLY SPREADS ACROSS THE WINDSHIELD.

IT JUST SEEMS A LITTLE QUESTIONABLE WHETHER OR NOT THE WINDSHIELDS ARE DEFECTIVE SOMEHOW.

**THE TIME BETWEEN THE FIRST AND SECOND OCCURRENCE IS APPROXIMATELY 5 WEEKS (TWO WEEKS BETWEEN THE FIRST REPLACEMENT AND SECOND CRACK.)**

I RESEARCHED ONLINE AND FOUND FORUMS WHERE OTHER TELLURIDE OWNERS HAD SIMILAR EXPERIENCES.

28

NOT SURE WHAT THE CAUSE IS, THIS IS MY FIRST TIME EVER HAVING A WINDSHIELD REPLACED MUCH LESS TWICE ALMOST IN THE SAME MONTH.

- NHTSA Complaint, March 7, 2022, ID No. 11455583: Windshield was repaired September 2020 after a rock chip spread immediately after impact. The recall covered the expense of that replacement. However, **the new windshield has the same defect and another rock chip spread immediately** and was quite large on impact March 2022. I was driving in a parking lot when it happened, so not a high enough speed to have the rock have much velocity to it. Kia needs to fix the issue when they have a recall, not replace it with the same issue.

- NHTSA Complaint, April 6, 2022, ID No. 11459810: **We have repaired the windshield several times and replaced it, and even the new windshield is cracked with the smallest of pebbles.** We have never had problems like this on our other vehicles. We have gone 15+ years without a windshield claim on insurance, and now we have ½ dozen on one car that is less than 2 years old.

- NHTSA Complaint, May 17, 2022, ID No. 11465032: I have owned this vehicle since July 2021. **In that time I have had to have two different windshields put in due to large unexpected cracks.**

- NHTSA Complaint, July 18, 2022, ID No. 11474458: **We have had the vehicle for less than a year and the windshield has already broken twice from very small/light pebbles**. The star caused by the most recent one was so small we didn't even hear it and has now spread to a 30"+ crack across windshield. We learned through researching that the windshields on these cars are becoming notorious for easy breakage and we do not feel safe having such a weak windshield. I have been driving for 18 years and have only ever once before had a windshield need replacement. The crack is so large I am afraid the glass will fall through while driving and it distorts the view. Should not have to keep replacing the windshield for every grain of sand that strikes it!

- <u>NHTSA Complaint, August 7, 2022, ID No. 11478027</u>: **I have experienced 3 windshield cracks within the visual field since purchasing the vehicle new.** Each time the pebbles are small and the crack is requiring complete windshield replacements.

128.   Kia had and has a duty to fully disclose the true nature of the Windshield Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the Defect poses an unreasonable safety hazard; because Kia had and has exclusive knowledge or access to material facts about the Class Vehicles' front windshield that were and are not known to or reasonably discoverable by Plaintiffs and the other Class Members; and because Kia has actively concealed the Windshield Defect from its customers.  Because the windshield contained in each Class Vehicle is defective, each Class Vehicle windshield should be replaced by Kia free of charge regardless of whether the windshield has failed, or the facts and circumstances surrounding any failure.

**Kia's Knowledge of the Defect**

129.   Kia became aware of the Windshield Defect in early 2019 through sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early internal reports from Kia dealerships describing the Windshield Defect, early consumer complaints made directly to Kia and its dealerships describing the Windshield Defect, NHTSA complaints describing the Windshield Defect which Kia monitored on a daily basis

30

and circulated internally, early consumer complaints made on Telluride enthusiast websites and social media that Kia actively monitors, aggregate warranty data compiled from Kia's network of dealers, aggregate windshield part sales data, testing and investigations conducted by Kia in response to consumer complaints, and repair order and parts data received by Kia from Kia's network of dealers.

130.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles which would necessarily have taken place prior to 2019, Kia, directly and/or through its agents or affiliated companies in the supply chain, necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' windshields: the types and properties of materials used to make them, including their durability and whether those materials would weaken over time regardless of wear and use; the basic engineering principles behind their construction; the forces and stresses the windshields would face; when and how the windshields would fail; and the cumulative and specific impacts on the windshields caused by wear and use, the passage of time, and environmental factors.

131.    An adequate pre-release analysis of the design, engineering, and manufacture of the windshields used for the Class Vehicles would have revealed to Kia that the windshields were insufficiently strong and durable for the intended use. Thus, during the pre-release design stage of the Class Vehicles, Kia would have known that the  windshield chosen for the Class Vehicles was defective and would pose a safety risk to owners/lessees and the motoring public.

31

132.   Kia also learned about the Windshield Defect because of the higher than expected number of replacement windshields ordered from Kia, which alerted Kia that this was a defective part.  Kia service centers use Kia replacement parts that they order directly from Kia and Kia maintains records of the number of windshields sold by its dealers – including windshields sold by Kia dealers to third party repair facilities. Therefore, Kia has detailed and accurate data regarding the number and frequency of replacement part orders, including replacement windshields.  The ongoing sales of replacement windshields was known to Kia and the volume of such sales alerted Kia that the Class Vehicle windshields were defective and posed a safety risk early on.

133.   Kia also knew about the Windshield Defect because numerous complaints regarding windshield failure were made directly to Kia when Class Vehicle owners submitted complaints to Kia's Consumer Affairs Department and Kia dealers reported the Windshield Defect to Kia via internal Techline Assistance Center Case Reports.  Kia had begun receiving these internal complaints and reports by at least March 2019 and circulated them internally. The large number of complaints, and the consistency of their descriptions of windshield failures, alerted Kia to the Windshield Defect affecting the Class Vehicles.  At all relevant times, the full universe of complaints made directly to Kia about the Windshield Defect is and was in the exclusive custody and control of Kia.

134.   Kia's own Goodwill Letter – which was dated November 4, 2019, before all Plaintiffs purchased or leased their vehicles  – acknowledges that by that point Kia

32

had already performed an investigation regarding the Windshield Defect and had

already received numerous complaints from Class Vehicle owners about their

windshields chipping and then cracking. *See* <u>Exhibit A.</u>

135.    Further, Kia also learned about the Windshield Defect via its review of

warranty and customer pay data detailing instances where Class Vehicle owners

sought repairs concerning the Class Vehicles' Windshield Defect.

**<u>The NHTSA Complaints and Online Discussions of the Defect:</u>**

136.    From the moment that Kia began selling the Class Vehicles, Kia

monitored NHTSA on a daily basis for complaints concerning the Class Vehicles to

detect quality issues and defects. When NHTSA complaints were submitted, Kia

immediately circulated the complaint internally.

137.    More than 200 Class Vehicle owners have complained about the

Windshield Defect to NHTSA.

138.    The volume and frequency of the NHTSA Complaints put Kia on notice

of the Windshield Defect.

139.    Attached as <u>Exhibit B</u> to the Complaint are more than 100 NHTSA

complaints submitted by owners of 2020 Kia Telluride vehicles.

140.    Attached as <u>Exhibits C and D</u> are more than 100 additional, near-

identical NHTSA complaints submitted by owners of 2021 and 2022 Kia Telluride

vehicles, respectively, which Kia actively monitored during the relevant time period,

and which likewise demonstrate that the Defect is widespread and dangerous, that Kia

33

has known about the defect at all relevant times, and the Windshield Defect impacts 2021-2022 Tellurides in exactly the same way it impacts 2020 Kia Telluride vehicles.

141.    Further, although Kia only recently began selling the 2023 Kia Telluride vehicles, owners of those Class Vehicles have already begun submitting NHTSA complaints describing the Windshield Defect that are identical to the complaints submitted by 2020-2022 Class Vehicle owners and support that the Class Vehicles suffer from the common Windshield Defects. *See, e.g.*:

- NHTSA Complaint No. 11500342, January 5, 2023 (Incident Date December 19, 2023): "Driving home from purchasing vehicle heard a pop like squeezing an empty water bottle. Did not know what it came from. Eventually noticed a fine line crack in lower corner of passenger side of windshield extending from edge of glass towards center and curving up. Length approximately 9-10 inches. Contacted dealer to be told they can't help us."

- NHTSA Complaint No. 11505361, February 3, 2023: "While driving on highway my new Kia Telluride's suddenly made a very loud and scary popping noise. I pulled off at next exit to find a large chip and crack in the top of windshield. I did not see a rock hit it so I'm not sure how it cracked. Completely unacceptable and a safety concern if the windshield cracks this easily."

- NHTSA Complaint No. 11510884, March 8, 2023 (Incident Date January 15, 2023): "Windshield failed on the way home from the dealership after small impact. Passenger side window developed cracks at 486 odometer miles. The windshield chip spread beyond repair during the 6-week warranty claim process in which the claim was denied on 3/8/2023. The side window never took an impact. As shown in the photo's the crack is covered by the sideview mirror and just behind the window molding. Claim was denied as Kia claims it took an impact based on the photos."

- NHTSA Complaint No. 11511038, March 9, 2023 (Incident Date March 8, 2023): "Driving down the road and I heard a crack/pop and noticed a dime sized chip in the windshield on the passenger side. No other vehicles nearby to attribute to a rock or something similar."

142.   In addition to the above NHTSA complaints, consumers were discussing the Windshield Defect online on Telluride-enthusiast websites as early as May 22, 2019.[2]  Owners made similar such complaints in early 2019 on Kia Telluride Facebook groups and other social media.  Kia regularly monitored these websites and social media for the specific purpose of identifying emerging issues with its new vehicles, and learned about the Windshield Defect from these sources.

143.   Although Kia was aware of the widespread nature of the Windshield Defect in the Class Vehicles, and that it posed grave safety risks, Kia did not disclose the Defect to Class Vehicle purchasers at the time of sale and has failed to take adequate steps to notify all Class Vehicle owners of the Defect and provide relief.

144.   Customers have reported the Windshield Defect in the Class Vehicles to Kia directly and through its dealers.  Defendant is fully aware of the Windshield Defect contained in the Class Vehicles.  Nevertheless, Defendant actively concealed the existence and nature of the Defect from Plaintiffs and the other Class Members at the time of purchase or repair and thereafter.  Specifically, Defendant:

---

[2]   *See*   https://www.kiatelluride.org/threads/is-there-really-a-problem-with-the-windshields-on-the-telluride.662/ (discussions and complaints about Windshield Defect was topic of conversation as of May 22, 2019) (last visited April 10, 2023); https://tellurideforum.org/threads/the-ultimate-telluride-windshield-chip-cracking-discussion.2341/ (discussions and complaints about Windshield Defect was topic of conversation as of June 9, 2019 with over 520 separate posts) (last visited April 10, 2023); https://www.kiatelluride.org/threads/windshield-chips-and-cracks.904/ (issues and complaints about Windshield Defect was topic of conversation as of July 10, 2019) (last visited April 10, 2023); https://www.kiatelluride.org/threads/windshield-on-back-order-not-happy.994/ (issues and complaints about Windshield Defect was topic of conversation as of August 19, 2019) (last visited April 10, 2023).

a. failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles' windshields, including the Windshield Defect;

b. failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles and their front windshield were not in good working order, were defective, and were not fit for their intended purpose; and,

c. failed to disclose and/or actively concealed the fact that the Class Vehicles and their front windshield were defective, despite the fact that Defendant learned of the Windshield Defect as early as 2019, if not before.

145.   Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at its dealerships or other third-party repair facilities and/or take other remedial measures related to the Windshield Defect contained in the Class Vehicles.

146.   Defendant has not recalled the Class Vehicles to repair the Windshield Defect, has not offered to its customers a suitable repair or replacement of parts related to the Windshield Defect free of charge, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Windshield Defect.

147.   Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

148.   As a result of the Windshield Defect, the value of the Class Vehicles has

36

diminished, including without limitation, the resale value of the Class Vehicles. Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's front windshield is not defective and will not crack, chip and/or fracture for no reason at all or under circumstances that would not cause non-defective windshields to similarly fail. Plaintiffs and Class Members further expect and assume that Kia will not sell or lease vehicles with known safety defects, such as the Windshield Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair. They do not expect that Kia would fail to disclose the Windshield Defect to them, and then purport to remedy the defect with an underinclusive and inadequate Customer Satisfaction Initiative.

## CLASS ACTION ALLEGATIONS

### A. The Classes

149. Plaintiffs seek to represent the following state classes pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and/or Fed. R. Civ. P. 23(c)(5):

**Georgia Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of Georgia (the "Georgia Class")

**Indiana Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of Indiana (the "Indiana Class")

**New Mexico Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of New Mexico (the "New Mexico Class")

**Pennsylvania Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of Pennsylvania (the "Pennsylvania Class")

37

**Tennessee Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of Tennessee (the "Tennessee Class")

**Texas Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of Texas (the "Texas Class")

**Virginia Class:** All persons who purchased or leased any 2020-2023 Kia Telluride vehicle in the State of Virginia (the "Virginia Class")

150.    Defendant and its employees or agents are excluded from the Classes.

## B. Numerosity

151.    Upon information and belief, the Classes are each so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased across the United States and thousands of Class Vehicles have been sold and leased in Georgia, Indiana, New Mexico, Pennsylvania, Tennessee, Texas and Virginia.

## C. Common Questions of Law and Fact

152.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members.  These questions include:

a.    whether the Class Vehicles suffer from the Windshield Defect;

b.    whether the Windshield Defect constitutes an unreasonable safety hazard;

38

c.   whether Defendant knows about the Windshield Defect and, if so, how long Defendant has known of the Defect;

d.   whether the defective nature of the Class Vehicles' front windshield constitutes a material defect;

e.   whether Defendant had and has a duty to disclose the defective nature of the Class Vehicles' front windshield to Plaintiffs and the other Class Members;

f.   whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g.   whether Defendant knew or reasonably should have known of the Windshield Defect contained in the Class Vehicles before it sold or leased them to Class Members; and

h.   Whether Defendant breached its express warranty and the implied warranties of merchantability and whether Defendant violated the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.*, Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1, *et seq.*, New Mexico Unfair Trade Practices Act,  N.M. Stat. Ann. § 57-12-2, *et seq.,* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq.,* Tennessee  Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, *et seq.,* Texas Deceptive Practices Act, Tex. Bus.

39

& Com. Code § 17.41, *et seq.,* and the Virginia Consumer Protection Act,

Va. Code Ann. §§ 59.1-196, *et seq.*, as alleged in this Complaint.

**D. Typicality**

153.   The Plaintiffs' claims are typical of the claims of the Classes since

Plaintiffs purchased defective Class Vehicles, as did each member of the Classes.

Furthermore, Plaintiffs and all members of the Classes sustained economic injuries

arising out of Defendant's wrongful conduct.  Plaintiffs are advancing the same claims

and legal theories on behalf of themselves and all absent Class members.

**E. Protecting the Interests of the Class Members**

154.   Plaintiffs will fairly and adequately protect the interests of the Class and

have retained counsel experienced in handling class actions and claims involving

unlawful business practices.  Neither Plaintiffs nor their counsel has any interest

which might cause them not to vigorously pursue this action.

**F. Proceeding Via Class Action is Superior and Advisable**

155.   A class action is the superior method for the fair and efficient

adjudication of this controversy.  The injury suffered by each individual Class

member is relatively small in comparison to the burden and expense of individual

prosecution of the complex and extensive litigation necessitated by Defendant's

conduct.  It would be virtually impossible for members of the Class individually to

redress effectively the wrongs done to them.  Even if the members of the Class could

afford such individual litigation, the court system could not.  Individualized litigation

40

presents a potential for inconsistent or contradictory judgments.  Individualized

litigation increases the delay and expense to all parties, and to the court system,

presented by the complex legal and factual issues of the case.  By contrast, the class

action device presents far fewer management difficulties, and provides the benefits of

single adjudication, an economy of scale, and comprehensive supervision by a single

court.  Upon information and belief, members of the Class can be readily identified

and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty

claims, registration records, and database of complaints.

156.    Defendant has acted, and refused to act, on grounds generally applicable

to the Classes, thereby making appropriate final equitable relief with respect to the

Classes as a whole.

### **FIRST CAUSE OF ACTION**
### **Breach of Implied and Express Warranties Pursuant to the Magnuson-Moss**
### **Warranty Act, 15 U.S.C. §2301, *et seq.***
### **(Plaintiffs individually)**

157.    Plaintiffs incorporate by reference all of the above paragraphs of this

Complaint as though fully stated herein.

158.    Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

159.    Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §

2301(4) and (5).

160.    Plaintiffs' vehicles are each a "consumer product" as defined in 15

U.S.C. § 2301(6).  15 U.S.C. § 2310(d)(1) provides a cause of action for any

41

consumer who is damaged by the failure of a warrantor to comply with the written and implied warranties.

161.    15 U.S.C. § 2304(a)(1) requires Defendant, as a warrantor, to remedy any defect, malfunction or nonconformance of the Plaintiffs' vehicles within a reasonable time and without charge to the Plaintiffs.

162.    The Defendant's sale of the defective vehicles to Plaintiffs and its failure and/or refusal to repair the Plaintiffs' vehicles' Windshield Defect within the applicable warranty period constitutes a breach of the written and implied warranties applicable to the Plaintiffs' vehicles.

163.    Despite repeated demands, Defendant has failed to remedy the Plaintiffs' vehicles' defects within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to Plaintiffs' vehicles.

164.    As a result of Defendant's breaches of the written and implied warranties, and Defendant's failure to remedy the same within a reasonable time, Plaintiffs have suffered damages.

## GEORGIA CLASS

## SECOND CAUSE OF ACTION
**Violation of the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390 *et seq.***
**(Plaintiff Nelson on Behalf of the Georgia Class)**

165.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

42

166.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 101-393(b), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

167.    Plaintiff Nelson and Georgia Class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

168.    Defendant engaged in "trade or commerce" within the meaning of Ga. Code Ann. § 10-1-393(b).

169.    Defendant violated the Georgia FBPA by misrepresenting and concealing and failing to disclose the Windshield Defect. Defendant had an ongoing duty to Plaintiff Nelson and the Georgia Class to refrain from unfair and deceptive practices under the Georgia FBPA in the course of its business.

170.    Plaintiff Nelson and the Georgia Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealments, misrepresentations, and/or failure to disclose material information.

171.    Plaintiff Nelson's counsel provided Defendant with a written demand for relief.

43

172.    Plaintiff Nelson and the Georgia Class are entitled to recover actual and treble damages and treble damages per Ga. Code Ann. § 10-1-399(a).

173.    Plaintiff Nelson also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA Code Ann. § 10-1-399.

### THIRD CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to Ga. Code. Ann. §§ 11-2-314 and 11-2A-212**
**(Plaintiff Nelson on Behalf of the Georgia Class)**

174.    Plaintiffs incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

175.    Defendant was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

176.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

177.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

178.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Nelson and the Georgia class members

44

purchased or leased the Class Vehicles, or at any time thereafter, and the Class

Vehicles are unfit for the ordinary purposes for which such vehicles are used.

Specifically, the Class Vehicles were and are not fit for their ordinary purpose of

providing reasonably reliable and safe transportation because the Class Vehicles suffer

from a Windshield Defect that makes driving unreasonably dangerous.

179.   As a result of Defendant's breach of the applicable implied warranties,

owners and lessees of the Class Vehicles suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles.  Defendant's actions, as complained of

herein, breached the implied warranty that the Class Vehicles were of merchantable

quality and fit for such use.

**FOURTH CAUSE OF ACTION**
**Breach of Express Warranties Pursuant to Ga. Code Ann. § 11-2-313**
**(Plaintiff Nelson on Behalf of the Georgia Class)**

180.   Plaintiffs  incorporate by reference all of the above paragraphs of this

Complaint as though fully stated herein.

181.   In connection with the sale or lease of the Class Vehicles to Plaintiff

Nelson and the Georgia Class members, Defendant provided Plaintiff Nelson and

class members with a New Vehicle Limited Warranty, under which it agreed to repair

or replace original components found to be defective in material or workmanship

within the first 60 months or 60,000 miles in service, whichever comes first.

182.   Plaintiff Nelson and Georgia Class members relied on Defendant's

warranties when they agreed to purchase or lease the Class Vehicles and Defendant's

45

1  warranties were part of the basis of the bargain.

2  183.  Plaintiff Nelson and the Georgia Class members submitted their Vehicles

3  for warranty repairs as referenced herein.  Defendant failed to comply with the terms

4  of the express written warranty provided to each Class member, by failing and/or

5  refusing to repair the Windshield Defect under the vehicle's warranty as described

6  herein.

7  184.  Plaintiff Nelson and Georgia Class members have given Defendant

8  reasonable opportunities to cure said defect, but Defendant has been unable and/or has

9  refused to do so within a reasonable time under its warranty.

10  185.  As a result of said nonconformities, Plaintiff Nelson and Georgia Class

11  members cannot reasonably rely on the Class Vehicles for the ordinary purpose of

12  safe, reliable, comfortable, and efficient transportation.

13  186.  Plaintiff Nelson and Georgia Class members could not reasonably have

14  discovered said nonconformities with the Class Vehicles prior to Plaintiff Nelson's

15  and Georgia Class members' acceptance of the Class Vehicles.

16  187.  As a direct and proximate result of the willful failure of Defendant to

17  comply with its obligations under the express warranties, Plaintiff Nelson and Georgia

18  Class members have suffered actual and consequential damages.  Such damages

19  include, but are not limited to, the loss of the use and enjoyment of their vehicles, and

20  a diminution in the value of the vehicles containing the defects identified herein.

46

1

## INDIANA CLASS

2

3

## FIFTH CAUSE OF ACTION

**Violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1, *et seq.***
**(Plaintiff Wilbur on Behalf of the Indiana Class)**

4

5

6        188.    Plaintiffs incorporate by reference all allegations contained in this

7    Complaint as though fully stated herein.

8

9        189.    Defendant is a "supplier" under Ind. Code. § 24-5-0.5-2(a)(3) by

10    advertising, offering for sale, selling, leasing, and/or distributing the Class Vehicles in

11    the United States, including Indiana.

12

13        190.    Plaintiff Wilbur and Indiana class members are consumers under Ind

14    Code § 24-5-0.5-1, et seq. because they sought or acquired the Class Vehicles by and

15    through a "consumer transaction."

16

17        191.    Under the Indiana Deceptive Consumer Sales Act ("IDCSA"), suppliers,

18    such as Defendant, are prohibited from engaging in unfair, abusive, or deceptive acts,

19    omissions, or practices in connection with a consumer transaction. Such acts,

20    omissions, or practices by suppliers such as Defendant are in violation of the IDCSA

21    whether they occur before, during, or after the transaction at issue, and include both

22

23    implicit and explicit misrepresentations.

24

25        192.    The allegations set forth herein constitute deceptive sales practices in

26    violation of Ind Code § 24-5-0.5-1, et seq.

27

28        193.    As described above, Defendant sold vehicles to class members even

47

though the vehicles are defective and pose a safety hazard, and failed to disclose its

knowledge of the Windshield Defect and its attendant risks at the point of sale or

otherwise.  Further, Defendant has refused to repair or replace the vehicles' defective

windshields pursuant to the terms of its warranty despite being provided a reasonable

opportunity to do so.

194.    Defendant knew that the Class Vehicles' front windshields suffered from

an inherent defect, were defectively manufactured or made, would fail prematurely,

and were not suitable for their intended use.

195.    Defendant was under a duty to Plaintiff Wilbur and the Indiana Class

Members to disclose the defective nature of the Class Vehicles' front windshields

and/or the associated repair costs because:

a.    Defendant was in a superior position to know the true state of facts about

the safety defect contained in the Class Vehicles' front windshields;

b.    Plaintiff Wilbur and the Indiana Class Members could not reasonably have

been expected to learn or discover that their front windshields have a

dangerous safety defect until after they purchased the Class Vehicles; and,

c.    Defendant knew that Plaintiff Wilbur and the Indiana Class Members

could not reasonably have been expected to learn about or discover the

Windshield Defect.

196.    The facts concealed or not disclosed by Defendant to Plaintiff Wilbur and

the Indiana Class Members are material in that a reasonable person would have

48

considered them to be important in deciding whether or not to purchase the Class Vehicles.

197.    Plaintiff Wilbur and the Indiana Class relied on Defendant to disclose material information it knew, such as the defective nature of the windshields in the Class Vehicles, and not to induce them into a transaction they would not have entered had the Defendant disclosed this information.

198.    By failing to disclose the Windshield Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

199.    The facts concealed or not disclosed by Defendant to Plaintiff Wilbur and the Indiana Class Members are material because a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Class Vehicles, or to pay less for them.

200.    Had Plaintiff Wilbur and the Indiana Class Members known that the Class Vehicles' front windshields were defective, they would not have purchased the Class Vehicles or would have paid less for them.

201.    Defendant's failure to disclose this information was misleading in a material respect because a reasonable consumer would have been misled by Defendant's conduct.

202.    Defendant's deceptive acts and practices were consumer-oriented because they had a broad range impact on consumers at large, affecting all owners and lessees of Class Vehicles.

49

203.   As a direct and proximate result of Defendant's unlawful methods, acts, and practices, Plaintiff Wilbur and the proposed Indiana members lost money or property because they have purchased and leased vehicles that they otherwise would not have, or in the alternative, would have paid less for. Meanwhile, Defendant has sold more Class Vehicles than it otherwise could have and charged inflated prices for the vehicles, unjustly enriching itself thereby.

204.   Defendant's deceptive acts and practices were willful and knowing because Defendant knew that the Class Vehicles' windshields were defective before it began selling Class Vehicles and chose not to disclose the problem to consumers. Plaintiff Wilbur and other members of the proposed Indiana Class seek appropriate injunctive relief, recovery of actual damages, treble damages, and their reasonable costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability Pursuant to Ind. Code § 26-1-2-314
### (Plaintiff Wilbur on Behalf of the Indiana Class)

205.   Plaintiffs incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

206.   Defendant is a merchant with respect to motor vehicles.

207.   The Class Vehicles were subject to implied warranties of merchantability, as defined in Ind. Code § 26-1-2-314, running from the Defendant to Plaintiff Wilbur and the Indiana Class members.

50

208.   An implied warranty that the subject vehicle was merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

209.   Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Wilbur and the Indiana class members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a Windshield Defect that makes driving unreasonably dangerous.

210.   As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## SEVENTH CAUSE OF ACTION
### Breach of Express Warranties Pursuant to Ind. Code § 26-1-2-313
### (Plaintiff Wilbur on Behalf of the Indiana Class)

211.   Plaintiffs  incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

212.   In connection with the sale or lease of the Class Vehicles to Plaintiff Wilbur and the Indiana Class members, Defendant provided Plaintiff Wilbur and class

51

members with a New Vehicle Limited Warranty, under which it agreed to repair or replace original components found to be defective in material or workmanship within the first 60 months or 60,000 miles in service, whichever comes first.

213.    Plaintiff Wilbur and Indiana Class members relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

214.    Plaintiff Wilbur and the Indiana Class members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the Windshield Defect under the vehicle's warranty as described herein.

215.    Plaintiff Wilbur and Indiana Class members have given Defendant reasonable opportunities to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time under its warranty.

216.    As a result of said nonconformities, Plaintiff Wilbur and Indiana Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

217.    Plaintiff Wilbur and Indiana Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Wilbur's and Indiana Class members' acceptance of the Class Vehicles.

218.    As a direct and proximate result of the willful failure of Defendant to

52

comply with its obligations under the express warranties, Plaintiff Wilbur and Indiana Class members have suffered actual and consequential damages. Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

<u>**NEW MEXICO CLASS**</u>

<u>**EIGHTH CAUSE OF ACTION**</u>
**Violation of the New Mexico Unfair Trade Practices Act,  N.M. Stat. Ann. § 57-12-2, *et seq.***
**(Plaintiff Ritzler on Behalf of the New Mexico Class)**

219.   Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

220.   The New Mexico Unfair Trade Practices Act declares "unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce" to be "unlawful." N.M. Stat. Ann. § 57-12-3, including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have," "representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another," "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive," and acts or practices that to a person's detriment "takes advantage of the lack of knowledge, ability, experience or

53

capacity of a person to a grossly unfair degree" or "results in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2.

221.   Defendant engaged in "trade or commerce" within the meaning of N.M. Stat. Ann. § 57-12-2(C).

222.   Defendant violated the New Mexico Unfair Trade Practices Act by misrepresenting and concealing and failing to disclose the Windshield Defect. Defendant had an ongoing duty to Plaintiff Ritzler and the New Mexico Class to refrain from unfair and deceptive practices under the New Mexico Unfair Trade Practices Act in the course of its business.

223.   Plaintiff Ritzler and the New Mexico Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealments, misrepresentations, and/or failure to disclose material information.

224.   Plaintiff Ritzler's counsel provided Defendant with a written demand for relief.

225.   Plaintiff Ritzler and the New Mexico Class are entitled to recover actual and treble damages per N.M. Stat. Ann. § 57-12-10.

226.   Plaintiff Ritzler also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the New Mexico Unfair Trade Practices Act per N.M. Stat. Ann. § 57-12-10.

# NINTH CAUSE OF ACTION

**Breach of Implied Warranty of Merchantability Pursuant to N.M. Stat. Ann. §
55-2-314**
**(Plaintiff Ritzler on Behalf of the New Mexico Class)**

227.   Plaintiffs incorporates by reference all of the above paragraphs of this
Complaint as though fully stated herein.

228.   Defendant is a merchant with respect to motor vehicles.

229.   The Class Vehicles were subject to implied warranties of
merchantability, as defined in N.M. Stat. Ann. § 55-2-314, running from the
Defendant to Plaintiff Ritzler and the New Mexico Class members.

230.   An implied warranty that the subject vehicle was merchantable arose by
operation of law as part of the sale or lease of the Class Vehicles.

231.   Defendant breached the implied warranty of merchantability in that the
Class Vehicles suffer from the defects referenced herein and thus were not in
merchantable condition when Plaintiff Ritzler and the New Mexico class members
purchased or leased the Class Vehicles, or at any time thereafter, and the Class
Vehicles are unfit for the ordinary purposes for which such vehicles are used.
Specifically, the Class Vehicles were and are not fit for their ordinary purpose of
providing reasonably reliable and safe transportation because the Class Vehicles suffer
from a Windshield Defect that makes driving unreasonably dangerous.

232.   As a result of Defendant's breach of the applicable implied warranties,
owners and lessees of the Class Vehicles suffered an ascertainable loss of money,

55

property, and/or value of their Class Vehicles.  Defendant's actions, as complained of

herein, breached the implied warranty that the Class Vehicles were of merchantable

quality and fit for such use.

## TENTH CAUSE OF ACTION
**Breach of Express Warranties Pursuant to N.M. Stat. Ann. § 55-2-313
(Plaintiff Ritzler on Behalf of the New Mexico Class)**

233.   Plaintiffs incorporate by reference all of the above paragraphs of this

Complaint as though fully stated herein.

234.   In connection with the sale or lease of the Class Vehicles to Plaintiff

Ritzler and the New Mexico Class members, Defendant provided Plaintiff Ritzler and

class members with a New Vehicle Limited Warranty, under which it agreed to repair

or replace original components found to be defective in material or workmanship

within the first 60 months or 60,000 miles in service, whichever comes first.

235.   Plaintiff Ritzler and New Mexico Class members relied on Defendant's

warranties when they agreed to purchase or lease the Class Vehicles and Defendant's

warranties were part of the basis of the bargain.

236.   Plaintiff Ritzler and the New Mexico Class members submitted their

Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with

the terms of the express written warranty provided to each Class member, by failing

and/or refusing to repair the Windshield Defect under the vehicle's warranty as

described herein.

237.   Plaintiff Ritzler and New Mexico Class members have given Defendant

56

reasonable opportunities to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time under its warranty.

238.   As a result of said nonconformities, Plaintiff Ritzler and New Mexico Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

239.   Plaintiff Ritzler and New Mexico Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Ritzler's and New Mexico Class members' acceptance of the Class Vehicles.

240.   As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiff Ritzler and New Mexico Class members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

## PENNSYLVANIA CLASS

### ELEVENTH CAUSE OF ACTION
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, et seq.**
**(Plaintiff Rocco on Behalf of the Pennsylvania Class)**

241.   Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

242.   The Pennsylvania Unfair Trade Practices and Consumer Protection law

57

CLASS ACTION COMPLAINT

declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful, 73 Pa. Stat. Ann. § 201-3(a), including, but not limited to, "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have," "(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," "(ix) Advertising goods or services with intent not to sell them as advertised," "(xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made," and "(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," 73 Pa. Stat. Ann. § 201-2(4).

243.   Defendant engaged in "trade or commerce" within the meaning of 73 Pa. Stat. Ann. § 201-2(3).

244.   Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection law by misrepresenting and concealing and failing to disclose the Windshield Defect, and failing to repair the Defect under Defendant's warranty. Defendant had an ongoing duty to Plaintiff Rocco and the Pennsylvania Class to refrain from unfair and deceptive practices under the Pennsylvania Unfair Trade Practices and Consumer Protection law in the course of its business.

58

245.    Plaintiff Rocco and the Pennsylvania Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealments, misrepresentations, failure to disclose material information, and/or failure to repair the Defect.

246.    Plaintiff Rocco's counsel provided Defendant with a written demand for relief.

247.    Plaintiff Rocco and the Pennsylvania Class are entitled to recover actual and treble damages per 73 Pa. Stat. Ann. § 201-9.2.

248.    Plaintiff Rocco also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

### TWELFTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to 13 Pa. Stat. § 2314**
**(Plaintiff Rocco on Behalf of the Pennsylvania Class)**

249.    Plaintiffs incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

250.    Defendant is a merchant with respect to motor vehicles.

251.    The Class Vehicles were subject to implied warranties of merchantability, as defined in 13 Pa. Stat. § 2314, running from the Defendant to Plaintiff Rocco and the Pennsylvania Class members.

252.    An implied warranty that the subject vehicle was merchantable arose by

59

operation of law as part of the sale or lease of the Class Vehicles.

253.    Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Rocco and the Pennsylvania class members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a Windshield Defect that makes driving unreasonably dangerous.

254.    As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## THIRTEENTH CAUSE OF ACTION
### Breach of Express Warranties Pursuant to 13 Pa. Stat. § 2313
### (Plaintiff Rocco on Behalf of the Pennsylvania Class)

255.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

256.    In connection with the sale or lease of the Class Vehicles to Plaintiff Rocco and the Pennsylvania Class members, Defendant provided Plaintiff Rocco and class members with a New Vehicle Limited Warranty, under which it agreed to repair

60

or replace original components found to be defective in material or workmanship within the first 60 months or 60,000 miles in service, whichever comes first.

257.   Plaintiff Rocco and Pennsylvania Class members relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

258.   Plaintiff Rocco and the Pennsylvania Class members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the Windshield Defect under the vehicle's warranty as described herein.

259.   Plaintiff Rocco and Pennsylvania Class members have given Defendant reasonable opportunities to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time under its warranty.

260.   As a result of said nonconformities, Plaintiff Rocco and Pennsylvania Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

261.   Plaintiff Rocco and Pennsylvania Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Rocco's and Pennsylvania Class members' acceptance of the Class Vehicles.

262.   As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiff Rocco and

Pennsylvania Class members have suffered actual and consequential damages.  Such

damages include, but are not limited to, the loss of the use and enjoyment of their

vehicles, and a diminution in the value of the vehicles containing the defects identified

herein.

**<u>TENNESSEE CLASS</u>**

**<u>FOURTEENTH CAUSE OF ACTION</u>**
**Violation of the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. §
47-18-101, *et seq.***
**(Plaintiff Herber on Behalf of the Tennessee Class)**

263.   Plaintiffs incorporate by reference all allegations contained in this

Complaint as though fully stated herein.

264.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits

"unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

Tenn. Code § 47-18-104.

265.   Defendant engaged in "trade or commerce" within the meaning of Tenn.

Code § 47-18-103(9).

266.   Defendant violated the Tennessee CPA by misrepresenting and

concealing and failing to disclose the Windshield Defect. Defendant had an ongoing

duty to Plaintiff Herber and the Tennessee Class to refrain from unfair and deceptive

practices under the Tennessee CPA in the course of its business.

267.   Plaintiff Herber and the Tennessee Class suffered ascertainable loss and

actual damages as a direct and proximate result of Defendant's concealments,

62

misrepresentations, and/or failure to disclose material information.

268.  Plaintiff Herber's counsel provided Defendant with a written demand for relief.

269.  Plaintiff Herber and the Tennessee Class are entitled to recover actual and treble damages per Tenn. Code §§ 47-18-109.

270.  Plaintiff Herber also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Tennessee CPA.

## FIFTEENTH CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability Pursuant to Tenn. Code §§ 47-2-314
### (Plaintiff Herber on Behalf of the Tennessee Class)

271.  Plaintiffs incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

272.  Defendant is a merchant with respect to motor vehicles.

273.  The Class Vehicles were subject to implied warranties of merchantability, as defined in Tenn. Code §§ 47-2-314, running from the Defendant to Plaintiff Herber and the Tennessee Class members.

274.  An implied warranty that the subject vehicle was merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

275.  Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in

merchantable condition when Plaintiff Herber and the Tennessee class members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because the Class Vehicles suffer from a Windshield Defect that makes driving unreasonably dangerous.

276.   As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

**SIXTEENTH CAUSE OF ACTION**
**Breach of Express Warranties Pursuant to Tenn. Code §§ 47-2-313)**
**(Plaintiff Herber on Behalf of the Tennessee Class)**

277.   Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

278.   In connection with the sale or lease of the Class Vehicles to Plaintiff Herber and the Tennessee Class members, Defendant provided Plaintiff Herber and class members with a New Vehicle Limited Warranty, under which it agreed to repair or replace original components found to be defective in material or workmanship within the first 60 months or 60,000 miles in service, whichever comes first.

279.   Plaintiff Herber and Tennessee Class members relied on Defendant's

64

1
2
3

warranties when they agreed to purchase or lease the Class Vehicles and Defendant's

warranties were part of the basis of the bargain.

4
5
6
7
8
9
10

280.   Plaintiff Herber and the Tennessee Class members submitted their

Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with

the terms of the express written warranty provided to each Class member, by failing

and/or refusing to repair the Windshield Defect under the vehicle's warranty as

described herein.

11
12
13
14

281.   Plaintiff Herber and Tennessee Class members have given Defendant

reasonable opportunities to cure said defect, but Defendant has been unable and/or has

refused to do so within a reasonable time under its warranty.

15
16
17
18

282.   As a result of said nonconformities, Plaintiff Herber and Tennessee Class

members cannot reasonably rely on the Class Vehicles for the ordinary purpose of

safe, reliable, comfortable, and efficient transportation.

19
20
21
22

283.   Plaintiff Herber and Tennessee  Class members could not reasonably

have discovered said nonconformities with the Class Vehicles prior to Plaintiff

Herber's and Tennessee  Class members' acceptance of the Class Vehicles.

23
24
25
26
27
28

284.   As a direct and proximate result of the willful failure of Defendant to

comply with its obligations under the express warranties, Plaintiff Herber and

Tennessee  Class members have suffered actual and consequential damages.  Such

damages include, but are not limited to, the loss of the use and enjoyment of their

vehicles, and a diminution in the value of the vehicles containing the defects identified

herein.

## TEXAS CLASS

### SEVENTEENTH CAUSE OF ACTION
**Violation of the Texas Deceptive Practices Act, Tex. Bus. & Com. Code § 17.41,**
***et seq.***
**(Plaintiff Dubose on behalf of the proposed Texas Class)**

285.   Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

286.   The Dubose Vehicle and the Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattel that were purchased or leased for use.

287.   Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

288.   Plaintiff Dubose and the Texas Class Members are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired their vehicle by purchase.

289.   At all relevant times, Defendant has engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

290.   The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer

1    Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, et seq.

2
3        291.    Defendant violated the DTPA by misrepresenting and concealing and

4    failing to disclose the Windshield Defect. Defendant had an ongoing duty to Plaintiff

5    Dubose and the Texas Class to refrain from unfair and deceptive practices under the in

6
7    the course of its business.

8        292.    Defendant's unfair and deceptive acts or practices occurred repeatedly in

9    Defendant's trade or business, were capable of deceiving a substantial portion of the

10
11   purchasing public and imposed a serious safety risk on the public.

12       293.    Moreover, Defendant's intentional concealment of and failure to disclose

13
14   the Windshield Defect constitutes an "unconscionable action or course of action"

15   under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff

16   Dubose and the Texas Class, that conduct took advantage of their lack of knowledge,

17
18   ability, and experience to a grossly unfair degree.  That "unconscionable action or

19   course of action" was a producing cause of the economic damages sustained by

20   Plaintiff Dubose and the Texas Class.

21
22       294.    In addition, Defendant is also liable under Tex. Bus. & Com. Code §

23   17.50(a) because Defendant's breach of the implied warranty of merchantability set

24   forth below was a producing cause of economic damages sustained by Plaintiff

25
26   Dubose and the Texas Class.

27       295.    Plaintiff Dubose and the Texas Class suffered ascertainable loss and

28   actual damages as a direct and proximate result of Defendant's concealments,

67

misrepresentations, and/or failure to disclose material information.

296.  Plaintiff Dubose and the Texas Class are entitled to recover actual and treble damages.  They also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the DTPA

## EIGHTEENTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability Pursuant to Tex. Bus. & Com. Code § 2.314
### (Plaintiff Dubose on behalf of the proposed Texas Class

297.  Plaintiff Dubose incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

298.  Defendant is a merchant with respect to motor vehicles.

299.  The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Dubose and the Texas Class members.

300.  An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

301.  Defendant breached the implied warranty of merchantability in that the Class Vehicles suffer from the defects referenced herein and thus were not in merchantable condition when Plaintiff Dubose and Texas class members purchased or leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit for the ordinary purposes for which such vehicles are used. Specifically, the Class Vehicles were and are not fit for their ordinary purpose of providing reasonably

68

reliable and safe transportation because the Class Vehicles suffer from a Windshield Defect that makes driving unreasonably dangerous.

302.   As a result of Defendant's breach of the applicable implied warranties, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

<u>**NINETEENTH CAUSE OF ACTION**</u>
**Breach of Express Warranty Pursuant to Tex. Bus. & Com. Code Ann. § 2.313**
**(Plaintiff Dubose on behalf of the proposed Texas Class)**

303.   Plaintiff Dubose incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

304.   In connection with the sale or lease of the Class Vehicles to Plaintiff Dubose and Texas Class members, Defendant provided Plaintiff Dubose and class members with a New Vehicle Limited Warranty, under which it agreed to repair or replace original components found to be defective in material or workmanship within the first 60 months or 60,000 miles in service, whichever comes first.

305.   Plaintiff Dubose and Texas Class members relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

306.   Plaintiff Dubose and the Texas Class members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms

of the express written warranty provided to each Class member, by failing and/or refusing to repair the Windshield Defect under the vehicle's warranty as described herein.

307.    Plaintiff Dubose and Texas Class members have given Defendant reasonable opportunities to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

308.    As a result of said nonconformities, Plaintiff Dubose and Texas Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

309.    Plaintiff Dubose and Texas Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to Plaintiff Dubose's and Texas Class members' acceptance of the Class Vehicles.

310.    Plaintiff Dubose and Texas Class members would not have purchased or leased the Class Vehicles, or would have paid less for the Class Vehicles, had they known, prior to their respective time of purchase or lease, that Class Vehicles contained the Windshield Defect.

311.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiff Dubose and Texas Class members have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

## VIRGINIA CLASS

## TWENTIETH CAUSE OF ACTION

**Violations of the Virginia Consumer Protection Act,
Va. Code Ann. §§ 59.1-196, et seq.
(Plaintiff Fisher on behalf of the Virginia Class)**

312.   Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

313.   The Virginia Consumer Protection Act prohibits, *inter alia,* "(14) using any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

314.   Defendant is a "person" as defined by Va. Code Ann. § 59.1-198.

315.   The transactions between Plaintiff Fisher and the other Class members on one hand and Defendant on the other, leading to the purchase or lease of the Vehicles by Plaintiff Fisher and the other Class members, are "consumer transactions" as defined by Va. Code Ann. § 59.1-198, because the Class Vehicles were purchased or leased primarily for personal, family or household purposes.

316.   The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices.

317.   Defendant violated the Virginia Consumer Protection Act by misrepresenting and concealing and failing to disclose the Windshield Defect. Defendant had an ongoing duty to Plaintiff Fisher and the Virginia Class to refrain from unfair and deceptive practices under the Virginia Consumer Protection Act in the

course of its business.

318.   Plaintiff Fisher and the Virginia Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealments, misrepresentations, and/or failure to disclose material information.

319.   Plaintiff Fisher's counsel provided Defendant with a written demand for relief.

320.   Plaintiff Fisher and the Virginia Class are entitled to recover actual and treble damages. They also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Virginia Consumer Protection Act.

## **TWENTY-FIRST CAUSE OF ACTION**

### **Breach of the Implied Warranty of Merchantability Pursuant to V.A. Code Ann. § 8.2-314**
### **(Plaintiff Fisher on behalf of the proposed Texas Class**

321.   Plaintiff Fisher incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

322.   Defendant is a merchant with respect to motor vehicles.

323.   The Class Vehicles were subject to implied warranties of merchantability running from the Defendant to Plaintiff Fisher and the Texas Class members.

324.   An implied warranty that the Class Vehicles were merchantable arose by operation of law as part of the sale or lease of the Class Vehicles.

325.   Defendant breached the implied warranty of merchantability in that the

CLASS ACTION COMPLAINT

Class Vehicles suffer from the defects referenced herein and thus were not in

merchantable condition when Plaintiff Fisher and Texas class members purchased or

leased the Class Vehicles, or at any time thereafter, and the Class Vehicles are unfit

for the ordinary purposes for which such vehicles are used. Specifically, the Class

Vehicles were and are not fit for their ordinary purpose of providing reasonably

reliable and safe transportation because the Class Vehicles suffer from a Windshield

Defect that makes driving unreasonably dangerous.

326.   As a result of Defendant's breach of the applicable implied warranties,

owners and lessees of the Class Vehicles suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles.  Defendant's actions, as complained of

herein, breached the implied warranty that the Class Vehicles were of merchantable

quality and fit for such use.

### TWENTY-SECOND CAUSE OF ACTION

**Breach of Express Warranty Pursuant to V.A. Code Ann. § 8.2-313
(Plaintiff Fisher on behalf of the Virginia Class)**

327.   Plaintiffs incorporate by reference all allegations contained in this

Complaint as though fully stated herein.

328.   In connection with the sale or lease of the Class Vehicles, Defendant

provided Plaintiff Fisher and the Virginia class members with a New Vehicle Limited

Warranty, under which it agreed to repair or replace original components found to be

defective in material or workmanship within the first 60 months or 60,000 miles in

73

service, whichever comes first.

329.  Plaintiff Fisher and the Virginia Class members relied on Defendant's warranties when they agreed to purchase or lease the Class Vehicles and Defendant's warranties were part of the basis of the bargain.

330.  Plaintiff Fisher and the Virginia Class members submitted their Vehicles for warranty repairs as referenced herein.  Defendant failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the Windshield Defect under the vehicle's warranty as described herein.

331.  Plaintiff Fisher and the Virginia Class members have given Defendant reasonable opportunities to cure said defect, but Defendant has been unable and/or has refused to do so within a reasonable time.

332.  As a result of said nonconformities, Plaintiff Fisher and the Virginia Class members cannot reasonably rely on the Class Vehicles for the ordinary purpose of safe, reliable, comfortable, and efficient transportation.

333.  Plaintiff Fisher and the Virginia Class members could not reasonably have discovered said nonconformities with the Class Vehicles prior to their acceptance of the Class Vehicles.

334.  As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiff Fisher and the Virginia Class members have suffered actual and consequential damages.  Such

damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the vehicles containing the defects identified herein.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves  and all others similarly situated, pray for judgment against Defendant as follows:

a.  An order certifying the proposed Classes, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

b.  An order awarding Plaintiffs and class members their actual damages, incidental and consequential damages, punitive damages, and/or other form of monetary relief provided by law;

c.  An order awarding Plaintiffs and the classes restitution, disgorgement, or other equitable relief as the Court deems proper;

d.  Equitable relief including, but not limited to, replacement or repair of the defective Class Vehicles' windshields with an extension of the express warranties and service contracts which are or were applicable to the Class Vehicles;

e.  A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

f.   Reasonable attorneys' fees and costs;

g.   Pre-judgment and post-judgment interest, as provided by law;

h.   Plaintiffs demand that Defendant perform a recall, and repair all Class Vehicles; and

i.   Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

DATED:  April 13, 2023                    TRINETTE G. KENT

By: _ /s/  Trinette G. Kent _
Trinette G. Kent
Lemberg Law, LLC
*Attorneys for Plaintiffs*

76

CLASS ACTION COMPLAINT